IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2024

**IN RE JOSCLYN M., ET AL.[1]**

**Appeal from the Juvenile Court for White County**
No. 5227-JV2156          John Meadows, Judge
_____

**No. M2023-01485-COA-R3-PT**
_____

This action involves the termination of a mother's parental rights to her minor children. Following a bench trial, the court found that clear and convincing evidence existed to establish the following statutory grounds of termination: (1) abandonment for failure to provide a suitable home; (2) substantial noncompliance with the permanency plans; (3) persistence of conditions which led to removal; and (4) failure to manifest an ability and willingness to assume custody of the children. The court also found that termination was in the best interest of the children. We affirm the trial court's termination decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and JEFFREY USMAN, J., joined.

J. Brad Hannah, Smithville, Tennessee, for the appellant, Deborah M.

Jonathan Skrmetti, Attorney General & Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.          BACKGROUND**

Josclyn, James, Meenah, Mitchell, and Kensi (collectively "the Children") were born to Deborah ("Mother") and Kristopher B. ("Father") in November 2007, February 2010, April 2011, November 2012, and February 2015, respectively. The Children resided

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

with their parents in a one-bedroom mobile home in White County, Tennessee. On September 2, 2021, the Tennessee Department of Children's Services ("DCS") received a referral alleging lack of supervision as a result of Mother's behavior while in public with the Children, who appeared with matted hair, dirty clothes, and missing shoes.

DCS attempted to conduct a home visit on September 8, but Mother refused entry. DCS returned the next day on September 9 with a court order and observed the home, which had animal feces strewn throughout the floor, broken windows, holes in the wall, exposed wires and insulation, cockroaches, and spoiled food in the refrigerator. The Children slept in the living room, with two boys on a couch with exposed springs and the three girls on a twin-sized mattress. The Children appeared with poor personal hygiene, e.g., matted hair, dirt on their skin, and their clothes caked in dirt and mud. The Children did not attend school; Mother advised that they attended "Farm School." DCS could find no such record of this school.

DCS returned on September 10 to find the Children in the same clothing as the day before. Mother advised that the Children were dirty because they played outside. She also blamed the condition of the home on the Children, claiming that they did not clean and that she could not make them. DCS spoke with Father on the telephone. He advised that he worked out of state and that the home was not in bad condition when he left. DCS offered services to Mother, including providing cleaning supplies, beds, and help in securing a stable living environment. Mother declined assistance. DCS petitioned for emergency custody due to the condition of the home and Mother's refusal to accept assistance.

The trial court granted the petition for emergency custody on September 13, 2021. The Children were adjudicated as dependent and neglected on November 1, 2021. The Children moved together through a few local foster placements before they were ultimately placed with family in Michigan on November 1, 2022, where they have since remained. The three girls were placed with the maternal step-uncle and his wife, while the two boys were placed with the maternal grandparents. The siblings visit each other frequently.

DCS developed four permanency plans for Mother, who was present and participated in the creation of the plans, which were ratified by the trial court. The plans contained the following requirements: (1) attend visitation and demonstrate appropriate parenting; (2) obtain and maintain safe, stable, clean, and appropriate housing; (3) complete a parenting assessment, follow recommendations, and demonstrate learned skills during visitation; (4) obtain and maintain a legal source of income and provide proof of income; and (5) complete a mental health assessment and follow recommendations.[2]

---

[2] The mental health assessment was added to the third permanency plan as result of Mother's combative and erratic behavior with DCS representatives.

While Mother completed some of the permanency plan requirements, she failed to demonstrate learned skills during visitation and her living situation deteriorated. On August 16, 2022, DCS filed the termination petition based upon the following grounds: (1) abandonment for failure to provide a suitable home; (2) substantial noncompliance with the permanency plans; (3) persistence of conditions which led to removal; and (4) failure to manifest an ability and willingness to assume custody of the children.[3]

The case proceeded to a hearing on the termination petition, beginning on June 14, 2023. Josclyn, James, and Meenah presented letters for the court's consideration, all requesting termination of Mother's parental rights to allow them to remain in their current placements without further hindrance. They advised the court of their living conditions while with Mother and assured the court that their situations have improved dramatically in their current placements, with proper housing, school attendance, and their needs met.

Josclyn appeared via video conference at the hearing and read her letter to the court. She confirmed through her testimony that she visits with her siblings every week. She testified that she finished her school year with all "A's" and "B's" and stated that she has her own bedroom in her current placement. She stated that she has her own bed with bed sheets and that there is food in the refrigerator at her residence. She agreed that Mother visited her regularly in person and now by telephone since she moved to Michigan. She stated that she would like to maintain contact with her mother but not live in the same residence. She continued,

> I know that when I lived with my mom that she didn't necessarily hang out with us a lot, she stayed in her bedroom a lot. And meanwhile, up here, we have, like, family time, we all watch tv together in the evenings, eat dinners together. Back when I lived with my mom, we didn't really eat dinner at all together, we ate in the living room, and she ate in her room.

> I feel like an important part of stability is family time and hanging out with parental figures, and I didn't experience much of that when I lived with my mom but now I am experiencing it.

She testified that she now takes care of her hygiene and is careful to brush her hair and her teeth in the morning before school.

Meenah testified similarly that she did not want to return to Mother's care and identified the letter she wrote for the court advising the same. She asserted that she was happy living with her sisters in her aunt and uncle's house and that she was able to see her brothers on a weekly basis, sometimes more.

---

[3] Father surrendered his parental rights prior to the hearing and is not a party to this appeal.

Christopher T. ("Uncle") testified that Josclyn, Meenah, and Kensi are placed in his home with his wife and their three biological children, aged 18, 15, and 8.[4] He professed their intent to adopt the girls should they become available for adoption. He admitted that it was initially a challenge to integrate the girls into their home but asserted that everything was "going well" at the present time and that the girls have bonded with the family. He acknowledged that Mother visited the girls regularly through video conferences but stated that it was difficult to keep them engaged with Mother, who sometimes fought with the DCS worker during the visit. He claimed that the Children engaged with each other while Mother listened and occasionally joined in the conversation.

James read his letter to the court and confirmed that he did not want to return to Mother's care. He professed that he was happy in his current placement with his brother and grandparents and that his needs were met, including meals on a daily basis. He stated that he visits his sisters and that he loves living in Michigan with his extended family. He agreed that he would like to maintain contact with Mother but asserted that he did not want to return because he feared he and his siblings would not have any clothes or food again. He believed that Mother had not established that she had changed her circumstances and would be able to provide for him and his siblings.

Mary J. ("Grandmother") confirmed that James and Mitchell live with her and her husband in their home. She professed their intent to adopt the boys should they become available for adoption. She stated that they provide for them and that the boys have evidenced improvement in their schooling and general wellbeing while in their care. She recalled that they both had difficulty attending to their hygiene when they first arrived but that they now have the necessary products to ensure appropriate hygiene. She asserted that the boys are happy and that they show appropriate affection and laugh on a regular basis. She recalled that they cared for the Children for approximately three months in 2021 and that she expressed concern for them at that time based upon their appearance. She confirmed that any time the Children visited them prior to removal that she would have to purchase them all new clothing and undergarments and attend to their hygiene upon arrival.

Jamesia Evans testified that she works for DCS as a family service worker and that she was assigned to the Children upon removal from the one-bedroom mobile home. She asserted that the mobile home was removed and that a one-bedroom camper van was set in its place. She recalled that the parents initially advised that a five-bedroom home would be built on the property shortly after removal but that their plans never came to fruition. The parents separated during the custodial episode and are in the process of divorcing.

Ms. Evans asserted that the camper has remained on the property throughout the custodial episode. The camper had electricity powered by a generator and running water

---

[4] He clarified that he has four biological children; however, one child has since reached the age of majority and no longer lives in the home.

from a hose attached to the camper. Ms. Evans testified that Mother lives in the camper with two dogs and a cat on the family property. She professed that she could not provide homemaker services for Mother because the residence was unsuitable for the Children, with only one bedroom. She stated that she was permitted entry on a few occasions and that she observed animal feces on the floor of the camper. She identified photographs she took of the residence at her most recent visit in April 2023. She was denied entry at that time; however, she described the smell around the camper as "putrid" and recalled that she vomited from the smell and had to leave to avoid further sickness. She identified photographs depicting debris around the camper and an overflowing trash can. She observed trash and boxes piled up inside the camper from the window. She recalled that Mother's most recent video teleconference with the Children showed Mother still inside the same camper. She opined that Mother's living conditions were worse than those present at the time of removal with even less space for the Children.

Ms. Evans assisted Mother in the development of a permanency plan upon the Children's removal and advised her of the importance of maintaining the cleanliness of the residence. She recalled that Mother refused cleaning supplies. She was unable to offer financial assistance to secure a new residence because Mother could not maintain regular rental payments for any period of time. She explained that Mother had been diagnosed with multiple sclerosis and had undergone some surgeries to improve her condition; however, she was unable to work due to her disability. Mother's total income per month was $933, including $233 in disability benefits and $700 in spousal support. She provided Mother with a copy of an application to the local housing authority with a pre-stamped envelope; however, Mother initially refused to pay $25 to secure a copy of her birth certificate that was necessary to complete the application. Ms. Evans said that Mother regularly purchased cigarettes throughout the custodial episode despite her limited income. She agreed that Mother's child support obligation was set at $0 due to her income.

Ms. Evans confirmed that she provided transportation services to Mother to facilitate her attendance at necessary appointments. She also attempted to keep Mother apprised of her obligations, but Mother often screamed at her and once "came at her" with her finger pointed in her face. She asserted that Mother was even belligerent and screamed at her in front of other DCS workers, Mother's attorney, and the Children. Despite Mother's ongoing belligerence, Ms. Evans assisted Mother in applying for food stamps and provided gas cards and gift cards for necessary items. She ultimately added a psychological assessment as a requirement to the permanency plan as a result of Mother's erratic behavior. Mother responded with profanity when advised of the new requirement.

Ms. Evans agreed that Mother completed her parenting assessment, attended parenting classes,[5] completed her paperwork to secure disability assistance, and even completed the psychological assessment and attended psychotherapy. Despite Mother's

---

[5] Mother actually completed two rounds of parenting classes.

progress on requirements of the permanency plan, Ms. Evans believed that Mother failed to evidence any learned skills from her fulfillment of such requirements. She explained that Mother spoke poorly about Father during visitation, discussed other topics that were inappropriate for visitation, and did not redirect the Children appropriately when necessary. She agreed that the parents brought snacks and food items for the Children at the beginning of the custodial episode but the Children interacted with Father more than Mother during those in-person visits. She recalled that Mother purchased Christmas gifts for the Children in 2020 but that the gifts were covered in dead bugs, bug fecal matter, and animal hair.[6] Further, Mother had yet to establish a suitable residence in a clean condition and large enough to house all five children. Ms. Evans asserted that when pressed for information, Mother advised that her living situation was none of her business but that she did have plans to secure housing once her divorce from Father was finalized.

As to the Children, Ms. Evans testified that she has observed emotional growth in all five children. She professed that Josclyn has cultivated friendships, is in the school band, and no longer evidenced signs of social anxiety. Similarly, Mitchell has bonded with his siblings after having struggled with the sibling relationship at the time of removal. She stated that the Children went on vacation together and provided pictures of them on the vacation that evidence their sibling bond and continued emotional growth. She opined that the issues she observed in the beginning were a result of the older siblings attempting to parent the younger siblings because that was how they related to each other before removal. She observed a more "laid back" relationship between the Children now that Josclyn and James can act as siblings rather than parents.

Mother called three witnesses who confirmed her completion of several permanency plan requirements. Jessica Crawford, employed by Health Connect as a family specialist, confirmed that Mother attended parenting classes and participated and acted appropriately while in class. She recalled conducting some classes with Mother in the camper. She advised that animals were present but that she did not view animal feces in the camper at that time. However, she did not believe the camper could adequately house five children.

Danielle Vogel, also employed by Health Connect, testified that she also conducted some parenting classes with Mother in attendance. She was able to observe one visit between Mother and the Children in 2022. She recalled that the three younger children were engaged with Mother but that the two older children were uninterested in the visitation. Mother attempted to involve the older children, who rebuffed her attempts.

Leah Knapp, employed by Mental Health Cooperative as an adult care manager, confirmed that Mother attended therapy but could not provide any specifics relating to Mother's interaction with her therapist.

---

[6] She did not give the Children the gifts provided by Mother.

Mother testified that Father tore down the modular home after the Children were removed. She provided that they were approved for the purchase of a five-bedroom modular home but that Father "took off" before they completed the purchase. She confirmed that she has been unable to maintain employment for the past twelve years due to medical complications. She was unsure of her exact diagnosis but explained,

> My whole left side don't want to work, I have hand tremors, and arm tremors, and my left leg doesn't want to work, I fall all the time.

She is unable to pay for food and remain current with her other financial obligations due to her limited ability to work. She has submitted housing applications in several counties with no response. She claimed that the smell around her residence emanated from a neighboring property, where the owners cooked methamphetamine. She believed she would be awarded the property in the divorce, thereby allowing her to establish a suitable residence for the Children. When asked how she would purchase said residence, she advised counsel that it was none of his business.[7] She estimated that she pays approximately $150 per month for electricity and $60 per month for water. She agreed that she was having trouble purchasing food for herself and that someone else feeds her animals.

Mother claimed that she was unable to adequately participate in visitation due to her mobility issues. However, she brought snacks and other items and engaged with the Children to the best of her ability. She claimed that Ms. Evans would not allow her to question the Children about certain topics like their schooling or their extracurricular activities. She expressed love and concern for the Children but acknowledged that she was unable to provide for them at the present time.

Following the hearing, the court issued a final order in which it found that the evidence presented established the statutory grounds alleged. The court also found that termination was in the best interest of the Children. This appeal followed.

## II.    ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.    Whether clear and convincing evidence supports the court's finding of statutory grounds for termination.

B.    Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Children.

---

[7] She also called counsel a derogatory name during cross-examination.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

In the event that the "resolution of an issue [] depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "[T]his court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV.   DISCUSSION

### A.

As indicated above, the trial court granted the termination petition based upon the following statutory grounds: (1) abandonment for failure to provide a suitable home; (2) substantial noncompliance with the permanency plans; (3) the persistence of conditions which led to removal; and (4) failure to manifest an ability and willingness to assume custody of the Children. Mother objects to the court's application of each ground of termination. We will address each ground in turn.

1.     Abandonment

A parent may be found to have abandoned his or her child by failing to establish a suitable home. Tenn. Code Ann. § 36-1-113(g)(1). This ground for the termination of parental rights is established when:

(a)     The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b)     The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c)     For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). This ground for termination requires DCS to make reasonable efforts to assist a parent in obtaining a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Kaliyah S.*, 455 S.W.3d 533, 555 n.32 (Tenn. 2015). Although the statute requires DCS to make reasonable efforts toward the establishment of a suitable home for "a period of four (4) months following the physical removal" of the children, "the statute does not limit the court's inquiry to a period of four months immediately following the removal." *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). It requires a "safe and stable environment in which a child can live and 'the presence of a care giver who can supply the care and attention a child needs.'" *In re James V.*, No.

M2016-01575-COA-R3-PT, 2017 WL 2365010, at *5 (Tenn. Ct. App. May 31, 2017) (quoting *In re Malaki E*., No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *9 (Tenn. Ct. App. Mar. 23, 2015)) (citation omitted).

Here, the Children were ordered into DCS custody on September 13, 2021. The trial court found that DCS made reasonable efforts to prevent removal. On appeal, Mother argues that DCS did not make reasonable efforts to assist her in establishing a suitable home following removal. She claims that DCS only offered a housing application and failed to provide further monetary assistance even though she is indigent.

The record is replete with DCS's reasonable efforts to assist Mother in establishing a suitable home for the Children throughout the custodial episode. As detailed above, DCS's efforts included developing permanency plans, providing the housing application, providing transportation, providing gift cards for necessary items, and assisting with her application for food stamps. Yet, Mother often responded to DCS's efforts with profanity and a belligerent attitude. She likewise refused access to the residence and refused cleaning supplies to improve the cleanliness of her living environment. The testimony established that Mother's residence deteriorated as time progressed to the point that Ms. Evans vomited due to the smell emanating from the residence. While Mother claimed to have applied to various housing authorities, she did not provide proof of her efforts and was unable to provide a date certain as to when she could provide a suitable residence, advising counsel at the hearing that her living situation was none of his business.

In this case, DCS's efforts to assist Mother exceeded her own efforts to establish a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c) ("The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]"). While we acknowledge Mother's indigent status, she failed to improve her current living situation by, at the very least, cleaning the home and removing the trash surrounding the home. The evidence does not preponderate against the trial court's finding that DCS attempted to provide assistance but that Mother refused assistance at times and has not made reciprocal reasonable efforts. Under the circumstances of this case, we conclude that Mother abandoned the Children by failing to establish a suitable home for them. We affirm the trial court's judgment terminating Mother's parental rights on this ground.

## 2.     Substantial noncompliance

A court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To terminate rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. "The trial court must then find that the noncompliance is substantial." *In re Hannah H.*, 2014 WL 2587397, at *10 (citation omitted). When determining whether the noncompliance was substantial, the court must do more than "count[ ] up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537. DCS must show "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 548–59; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)).

As indicated above, Mother was advised of the following permanency plan requirements: (1) attend visitation and demonstrate appropriate parenting; (2) obtain and maintain safe, stable, clean, and appropriate housing; (3) complete a parenting assessment, follow recommendations, and demonstrate learned skills during visitation; (4) obtain and maintain a legal source of income and provide proof of income; and (5) complete a mental health assessment and follow recommendations. We acknowledge Mother's willingness to complete parenting classes and assessments, her regular attendance at visitation, her regular attendance in counseling sessions, and her completion of paperwork to secure disability assistance.

Despite Mother's efforts, she has not addressed the single most important requirement in this case, namely her living situation. She has also not evidenced learned skills from her attendance at parenting classes or her participation in therapy as evidenced by her behavior at visitation and her behavior toward DCS throughout the custodial episode and toward counsel at the hearing. Completion of the requirements should have resulted in changed behavior and a willingness to parent appropriately and to provide a suitable residence for the Children. Mother has not evidenced any change as a result of the custodial episode. With these considerations in mind, we must hold that her noncompliance was substantial and that clear and convincing evidence supported this ground of termination.

3. Persistence of conditions

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

The record reflects that the conditions which led to removal in September 2021 were child safety concerns due to environmental neglect. Mother's living situation has only deteriorated since the time of removal. Her new residence is even smaller than the prior residence, and she has failed to maintain said residence in a clean and suitable condition as of the hearing date in June 2023. Mother agreed that she could not care for the Children at the present time in her current residence. She was unable to provide a date certain by which she could improve her residence, advising counsel that it was none of his business. Following our review, we conclude that there is little likelihood that the conditions which led to removal will be remedied at an early date so that the Children can be safely returned in the near future and that the continuation of the parent's relationship greatly diminishes their chances of early integration into a safe, stable, and permanent home. Accordingly, we affirm the trial court on this ground of termination.

- 13 -

4. Failure to manifest an ability and willingness to assume custody

Pursuant to Tennessee Code Annotated section 36-1-113(g)(14) parental rights may be terminated when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). First, a petitioner must prove that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *In re Neveah M.*, 614 S.W.3d at 674. Second, a petitioner must prove that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*

As to the first element, our Supreme Court has instructed as follows:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677 (citation omitted).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732 (footnotes omitted)).

Mother did not evidence an ability or willingness to assume custody of the Children. Her living situation was worse than what DCS encountered at the time of removal, and Mother admitted that she was unable to even provide for herself at the time of the hearing, let alone five children. Despite assistance from DCS and several years without the Children in her care, Mother failed to improve her living circumstances by even maintaining a clean residence. From these facts, we agree with the trial court that Mother displayed an overall lack of an ability and willingness to assume legal and physical custody of the Children. The record further supports a finding that placing the Children with her would pose a risk of substantial physical or psychological harm to their welfare given the state of Mother's living situation and her inability to provide basic necessities for the Children's care, e.g., food and hygiene products. With all of these considerations in mind, we affirm the court's judgment terminating Mother's parental rights on this ground.

C.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must now consider whether termination of Mother's parental rights was in the best interest of the Children. Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

- 15 -

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2)     When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3)     All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4)     Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[ ] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's). We will group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case because many of these factors touch on similar factual predicates and involve similar issues. *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We consider first the Children's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect wellbeing), (D) (concerning the parent-child attachment), (E) (concerning visitation), (F) (concerning whether the children are fearful of the parent), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's mental and emotional fitness and its corresponding impacts). With respect to these factors, the Children are in need of stability as evidenced by their progress in their current placements since the time of removal. The three oldest children indicated their desire to remain in their current placements, despite their love and concern for Mother. The record reflects that visitation with Mother was not fruitful, with Mother, at times, demonstrating combative behavior with the Children and with Ms. Evans. The Children have maintained their sibling bonds in their current placements, and their respective placements have indicated intent to pursue adoption upon termination of Mother's rights.

We turn next to the Children's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent's home triggers or exacerbate the children's experience of trauma or post-traumatic symptoms), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the children's needs), and (R) (involving the health and safety of the home). Mother has failed to establish a suitable home for the Children throughout the custodial episode and her circumstances have deteriorated. She is unable to provide basic necessities, e.g., food and hygiene products.

Next, we consider Mother's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the children's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (concerning efforts made by DCS); and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal). Mother's failure to

improve her living situation despite assistance from DCS evidenced her lack of effort to meet the Children's needs. She has also not exhibited a sense of urgency in addressing the circumstances which led to removal by simply maintaining a clean residence.

With regard to support and knowledge of the Children's needs, Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing the parent providing more than token support), (P) (addressing the parent's understanding of their needs), the record reflects that Mother was not tasked with remitting child support given her limited financial means.

The trial court considered all the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination. Upon our review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record supports a determination that termination of Mother's parental rights was in the Children's best interest.

## V.  CONCLUSION

The judgment of the trial court is affirmed. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Deborah M.

_____
JOHN W. McCLARTY, JUDGE